IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

N.E.L., M.M.A., and E.M.M.,

     Plaintiffs,

     v.                          Case No. 17-2155-CM

MONICA GILDNER, et al.,

     Defendants.

## MEMORANDUM AND ORDER

Plaintiffs N.E.L., M.M.A., and E.M.M. bring this action against defendants Monica Gildner, Angela Webb, and Tina Abney, for violations of their constitutional rights under 42 U.S.C. § 1983. Plaintiffs allege defendants—who at the relevant time were social workers with the Kansas Department of Children and Families ("DCF")—engaged in a series of acts which led to plaintiffs' unconstitutional seizure and detainment. The matter is now before the court on defendants' Motion to Dismiss Second Amended Complaint (Doc. 120). For the reasons set forth below, the court grants the motion.

### I.    Background

This case has a long, storied past. It comes before this court after it was transferred from the District of Colorado on March 14, 2017. Plaintiffs originally filed their complaint in the District of Colorado on December 31, 2015, alleging constitutional violations against defendants as well as two Colorado state officials and Douglas County, Colorado. A magistrate judge recommended the district court grant defendants' motions to dismiss, finding the Colorado defendants were entitled to qualified immunity and that the court lacked personal jurisdiction over the Kansas defendants. (Doc. 91.) The district court judge adopted the recommendations and transferred the claims against the Kansas

defendants to this court.  (Doc. 98.)  Upon transfer, plaintiffs filed a second amended complaint against defendants.  This amended complaint is the subject of the current motion to dismiss.

Accepting the facts in the second amended complaint as true and viewing them in the light most favorable to the plaintiffs, the court will summarize the incident that gave rise to the current litigation.

Plaintiffs are three of John Doe and Jane Doe's ten children.  In 2008, John Doe, Jane Doe, and their ten children lived in Johnson County, Kansas.  In the spring of 2008, one of the younger children, who is not a party to this case, began exhibiting troubling behavior and making comments regarding improper behavior involving a relative of Jane Doe.  The parents made a report to authorities at the Kansas Department of Social and Rehabilitation Services (now known as DCF) and advised them that none of their children had seen the relative, or any other members of Jane Doe's family, since 2006.

Defendant Monica Gildner was assigned by her superiors, defendant Angela Webb and defendant Tina Abney, to oversee the Doe family's case.  Defendants referred the children to Sunflower House for interviews regarding the alleged abuse.  After a criminal investigation into the allegations against the relative, law enforcement notified defendant Gildner that no charges would be pursued.  Gildner then closed the Doe family's file.  After the file was closed, however, the reporting child shared additional information, which the parents reported to DCF.  Defendant Gildner referred the child again to the Sunflower House and reopened the DCF file.  Another Doe child then reported abuse by the same relative and was referred to the Sunflower House.  The children were also seeing a counselor.

At some point, defendant Gildner took the position that the abuse allegations against the relative were fabricated and that Jane Doe was suffering from post-partum depression and mental instability. She recommended the children continue counseling and that Jane Doe begin counseling.  John Doe then attempted to cease contact with defendant Gildner because of her adversarial position to his wife and him and her "antagonistic, biased, and baseless positions."  Defendants Webb and Abney refused to

replace defendant Gildner with a different social worker.  At some point after John Doe asked for defendant Gildner to be taken off the case, Gildner threatened to initiate court action and required that the entire family participate in Family Preservation Services, which plaintiffs allege was in retaliation for John Doe's complaint against her.

In February 2009, defendant Gildner received two more reports regarding the allegations by the second-reporting Doe child.  Shortly thereafter, John Doe filed a formal complaint with DCF regarding defendant Gildner's inaction as he was concerned that no medical exams were ordered and no follow up interviews were being conducted for the child.  Defendant Gildner sought a meeting with John Doe to discuss her concerns about the children being subjected to continued interviews about the allegations and how the family was going to move forward.  Plaintiffs allege defendant Gildner believed the relative and maternal grandmother's denials of the alleged abuse over the children's claims.  Defendant Gildner told John Doe that if he refused to meet with her or participate in recommended services that she may have to involve the District Attorney's Office and the court.  Plaintiffs allege this meeting and the imposition of services was in retaliation for their complaint against her.

In March 2009, a third Doe child reported abuse allegations by the same relative to DCF.  On April 20, 2009, the District Attorney's Office filed Child In Need Of Care ("CINC") petitions for all ten of the Doe children in the Johnson County, Kansas District Court.  After the petitions were filed, the court set a non-emergency hearing for May 11, 2009.  The children remained in John and Jane Doe's custody.

On April 29, 2009, John Doe notified defendant Gildner that he was willing to participate in Family Preservation Services.  On April 30, 2009, defendant Gildner was notified by a relative of the Doe family that Jane Doe and the children may have left town.  Evidence suggested Jane Doe and the children had gone to Colorado.  On May 4, 2009, defendant Gildner went to the Doe home and met John

Doe, who told her any contact with him needed to be through his attorney. John Doe provided the address of where the family was in Colorado to the Overland Park, Kansas police.

On May 5, 2009, defendants sought an ex parte order of protective custody. An application for the order was filed by the District Attorney's Office and was granted by the Johnson County District Court. According to the order, the court found:

1. that remaining in the home would be contrary to the welfare of the children,

2. immediate placement was in the best interest of the children based on allegations of physical, sexual, mental, or emotional abuse in the CINC petitions and,

3. it was reported that the children had left the area, that John Doe had refused to provide any information about the whereabouts of the children, and that the whereabouts of the children were presently unknown.

Plaintiffs allege defendants "fraudulently misrepresented to the court the factual basis for obtaining the Ex Parte Orders and participated in intentionally crafting the language of the Ex Parte Order to make it appear that an immediate danger to the children existed when Defendants knew in fact that no such immediate danger existed or . . . they had no facts upon which to form a reasonable suspicion that Plaintiffs were in immediate danger . . ." (Doc. 114, at 15–16.)

Plaintiffs allege the following facts in the ex parte order that falsely state or insinuate in a manner intended to alarm and mislead:

- That the parents had committed physical, sexual, mental, or emotional abuse when such statement had no basis in the facts alleged in the CINC petitions or in the facts known to defendants.

- That John and Jane Doe had refused Family Preservation Services when in fact John Doe had specifically accepted the offer of Family Preservation Services.

- That an emergency existed which threatened the safety of the children when defendants knew the Doe children were not in danger based on their actions:

  - in initially closing the DCF file

  - in disbelieving that the children's abuse had actually occurred

  - in filing CINC petitions only after John Doe had lodged a complaint against defendant Gildner

  - in not seeking immediate custody of the children upon filing the CINC petitions

  - in failing and refusing to contact John and Jane Doe's attorney or the children's court-appointed guardian *ad litem* prior to seeing the ex parte order.

- That John Doe would not provide any information on the whereabouts of the children when he actually instructed defendant Gildner to contact his attorney, which she did not.

- That the whereabouts and safety of the children were unknown, when defendants knew that Jane Doe and the children had gone to Colorado and defendants made no attempt to obtain information from the children's guardian *ad litem.*

Plaintiffs also allege defendants intentionally or recklessly failed to disclose the following facts that, but for their omission, would have resulted in a denial of the ex parte order:

- The CINC petitions contained no prohibition against travel by John or Jane Doe or the children before the CINC hearing.

- The request for the ex parte order was in retaliation for John and Jane Doe's complaint against defendant Gildner and/or for their retaining counsel to represent them.

- Defendants had failed to contact either the children's guardian *ad litem* or John and Jane Doe's attorney before seeking the ex parte order.

- Defendants disbelieved the children's allegations of abuse by their relative.

- Defendants had no reasonable suspicion to believe any of the Doe children were in imminent danger of physical harm or neglect.

- The Doe children did not meet the definition of children in need of care under K.S.A. § 38-2202(d).

Plaintiffs allege that the ex parte orders lacked any objectively reasonable basis for believing the facts alleged in support were sufficient to establish probable cause to temporarily remove the children from the custody of their parents, and defendants applied for the orders without an objectively reasonable basis for believing there was probable cause.

On May 6, 2009, Jane Doe was with her ten children visiting family friends in Douglas County, Colorado. Lesa Adame, a social worker with the state of Colorado, and Carl Garza, an employee of the Douglas County, Colorado Sheriff's Office, went together to the home where Jane Doe and the Doe children were staying. Adame and Garza told the family friend, Dr. G, that they had a court order from the State of Kansas to seize custody of all ten of the Doe children. Adame and Garza entered the home with an order from the Colorado Department of Social Services and the Douglas County Department of Human Services that required Dr. G and his wife Mrs. G to take custody of the Doe children and follow through with a safety plan. The order also required Jane Doe to not have any contact with the children. Dr. and Mrs. G were allowed to personally transport the Doe children to Kansas, and upon arrival in Kansas, the children were transferred to DCF custody. Dr. G requested temporary custody of the children or, alternatively, for the children to be placed in the custody of their paternal grandparents. DCF declined this request and instead separated the children and placed them with foster families.

## II.    Legal Standards

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 8(a)(2) states that a pleading must contain "a short and plain statement of

the claim showing that the pleader is entitled to relief." To withstand a motion to dismiss under 12(b)(6), a complaint must contain "enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim is plausible when "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). When the complaint contains well-pleaded factual allegations, a court should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

Generally, when reviewing a Rule 12(b)(6) motion, a court only considers the contents of the complaint. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Exceptions to this rule include: 1) documents that the complaint incorporates by reference, 2) documents referred to in the complaint if the documents are central to the plaintiffs' claim and the parties do not dispute the documents' authenticity, and 3) matters of which a court may take judicial notice. *Id.*; *see also Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964 (10th Cir. 1994) (courts may consider documents attached to the complaint when reviewing a 12(b)(6) motion); *Van Woudenberg v. Gibson,* 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."), *abrogated on other grounds by McGregor v. Gibson,* 248 F.3d 946, 955 (10th Cir.2001); *GFF Corp. v. Assoc'd Wholesale Grocers, Inc*., 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

In this case, plaintiffs have attached various documents to their second amended complaint, including a copy of the Ex Parte Order of Protective Custody filed in Johnson County District Court on

May 5, 2009 (Doc. 114-1), and a "Safety Plan" from the Colorado Department of Social Services and Douglas County Department of Human Services (Doc. 114-2).  In their motion to dismiss, defendants attached:

    1) Motion for Request for Ex Parte Orders of Protective Custody filed by the Johnson County District Attorney on May 4, 2009,

    2) copies of the CINC petitions for all three plaintiffs filed April 20, 2009 in Johnson County District Court,

    3) copies of the Ex Parte Order of Protective Custody for all three plaintiffs filed May 5, 2009 in Johnson County District Court,

    4) copies of the Motion for Pick-Up Order for all three plaintiffs filed May 5, 2009 in Johnson County District Court,

    5) copies of the Order for Pick Up filed May 5, 2009 in Johnson County District court for all three plaintiffs, accompanied by an affidavit submitted by the District Attorney in support of the Pick-Up Order,

    6) Journal Entry Nunc Pro Tunc filed on May 8, 2009 in Johnson County District Court ordering the Doe children be placed in custody of the Secretary of Social and Rehabilitation Services.

(Docs. 123-1–14 *SEALED*.)

Because there is no dispute to the authenticity of these documents, and because the plaintiffs refer to these documents in their complaint and the facts in the documents are central to plaintiffs' claims, the court will consider the exhibits without converting the motion into a motion for summary judgment.

**III.    Analysis**

Plaintiffs' Second Amended Complaint includes the following claims:

1)  Unlawful seizure in violation of the Fourth Amendment,

2)  Unlawful detention in violation of the Fourth Amendment,

3)  Deprivation of familial association in violation of the Fourteenth Amendment,

4)  Conspiracy (with the Colorado officials) to deprive plaintiffs of their constitutional rights,

5)  Exemplary damages,

6)  Deprivation of the right to travel, and

7)  Malicious prosecution and/or abuse of process.

All of the claims are related to defendants' conduct in seeking the ex parte order for protective custody, which, when it was granted by a judge in Johnson County District Court, resulted in plaintiffs' removal from Jane Doe's custody in Colorado and subsequent temporary placement in state custody.

Defendants move to dismiss the complaint arguing 1) the *Rooker-Feldman* doctrine bars plaintiffs' claims, 2) they are entitled to absolute immunity, 3) plaintiffs failed to state a claim as the seizure was inherently reasonable, 4) plaintiffs failed to state a claim for deprivation of their right to familial association, 5) plaintiffs failed to state a claim for malicious prosecution or abuse or process, 6) plaintiffs failed to state a claim for deprivation of the right to travel, 7) they are entitled to qualified immunity, 8) plaintiffs failed to establish defendant Webb and defendant Abney's personal involvement, and 9) the claims are barred by the statute of limitations.

   a.  *Rooker-Feldman*

Defendants insist that the *Rooker-Feldman* doctrine applies to plaintiffs' claims and, therefore, this court does not have jurisdiction over the case.  Because this implicates whether the court has subject matter jurisdiction over the case, the court will take up this argument first.

The *Rooker-Feldman* doctrine "precludes lower federal courts 'from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment.'"  *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010)

(citing *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1233 (10th Cir. 2006)).  The doctrine extends to "all state-court decisions—final or otherwise . . . and covers not only claims actually decided by the state court but issues inextricably intertwined with such claims."  *Atkinson-Bird v. Utah, Div. of Child & Family Servs.*, 92 F. App'x 645, 647 (10th Cir. 2004).  The Supreme Court has recently clarified the "narrow scope" of the doctrine, noting it applies only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Wagner*, 603 F.3d at 1193 (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).  In deciding whether the doctrine applies, courts should determine whether "the state-court judgment *caused*, actually and proximately, the *injury* for which the federal-court plaintiff seeks redress," and whether success on the claims "would require the district court to review and reject [the state court's] judgments."  *Id*.  For example, the doctrine would bar a claim for constitutional violations if the alleged violation was the result of the state court's order.  *See Atkinson-Bird*, 92 F. App'x at 647 ("[A]n unsuccessful state litigant cannot challenge an adverse state judgment and circumvent the rule of *Rooker-Feldman* simply 'by bringing a constitutional claim under the civil rights statutes.'")

Defendants claim the *Rooker-Feldman* doctrine applies, arguing plaintiffs are effectively seeking appellate review of the ex parte order of protective custody.  Defendants note that orders of temporary custody are appealable under K.S.A. § 38-2273, therefore the ex parte order was a final, appealable order and plaintiffs chose not to seek appellate review and are prohibited from seeking such review in this court.  The doctrine further precludes subject matter jurisdiction because the relief plaintiffs seek is "inextricably intertwined" with the ex parte order.

First, there is no indication the ex parte order was a final, appealable order.  The Kansas Court of Appeals has held that an ex parte order is not appealable because it does not fall under the definition

of "temporary custody order" in K.S.A. § 38-2243 and because "[e]x parte orders issued . . . upon a verified application are designed to be short-lived orders that remain in effect until the temporary custody hearing. . . ." *In re K.W.C.*, Nos. 112,904–907, 2015 WL 6112013, at *5 (Kan. Ct. App. Oct. 16, 2015). Regardless, the doctrine applies to all state-court decisions "final or otherwise," including issues "inextricably intertwined with such claims." *Atkinson-Bird*, 92 F. App'x at 647.

Although defendants argue that plaintiffs' claims in substance attack the state-court order and/or are "inextricably intertwined" with the issues in the order, the court finds they do not. Plaintiffs allege that defendants' pre-order conduct—including misleading the court with factual misrepresentations and omissions and seeking an ex parte order fully knowing there was no probable cause to do so—ultimately led to their illegal seizure. Plaintiffs are not asking for the invalidation of the ex parte order, rather, they seek relief for defendants' alleged illegal actions which led to the issuance of that ex parte order. *See Kovacic v. Cuyahoga Cnty. Dep't of Children & Families*, 606 F.3d 301, 310 (6th Cir. 2010) (finding the *Rooker-Feldman* doctrine did not apply to plaintiffs' Fourth Amendment claims and claims for due process violations because they did not "seek review or reversal of the decision of the juvenile court to award temporary custody to the state, but instead focus[ed] on the conduct of Family Services and of the social workers *that led up to* the juvenile court's decision to award temporary custody to the County."). Because the Supreme Court has advised that the *Rooker-Feldman* doctrine has a "narrow application," the court finds it does not apply in this case and subject matter jurisdiction exists over plaintiffs' claims.

   b. *Absolute Immunity*

Defendants next argue they have absolute immunity from suit based on the nature of their functions. Absolute immunity is "necessary to assure that judges, advocates, and witnesses can perform their respective functions, often controversial, without concern about possible repercussions." *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990). The Supreme Court has applied a "functional approach"

when determining whether particular acts of government officials are eligible for absolute immunity, looking to "the nature of the function performed, not the identity of the actor who performed it." *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). The Tenth Circuit has held that "the more distant a function is from the judicial process, the less likely absolute immunity will attach." *Snell*, 920 F.2d at 687. So, for example, an officer applying for a warrant is not absolutely immune from suit, but a prosecutor seeking an indictment may enjoy absolute immunity. *Id.* The Tenth Circuit has found specifically that social workers are not absolutely immune from suits involving their investigative functions. *See Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F. 3d 1306, 1314 (10th Cir. 1999) (denying absolute immunity for social workers in a suit related to their "participation in the investigative act of seeking a placement order). In contrast, the Tenth Circuit has granted absolute immunity for social workers in suits related to their functions as a testifying witness. *See English v. LeBaron*, 3 F. App'x 872, 873 (10th Cir. 2001).

Because the facts in the second amended complaint allege defendants committed constitutional violations when they relied on factual misrepresentations and omissions when they recommended the District Attorney seek an ex parte order of protective custody, the court finds absolute immunity does not apply, as defendants' conduct involved their investigative function.

### c. *Qualified Immunity*

Defendants next argue that if they are not absolutely immune, they are at least entitled to qualified immunity. Qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A defendant is entitled to qualified immunity unless the plaintiff can show "(1) a reasonable jury could find facts supporting a

violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). The Supreme Court has held a court has the discretion to consider "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Following this instruction from the Supreme Court, the court will first address whether defendants violated clearly established law. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Determining when a law is clearly established ordinarily requires "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains." *Booker*, 745 F.3d at 427. The Tenth Circuit has adopted a sliding scale approach to determine when law is clearly established. *Id.* Under the sliding scale approach, "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to establish the violation." *Id.* The question we must answer, therefore, is whether officials—in this case social workers—"of reasonable competence could disagree about the lawfulness of the challenged conduct." *Gomes v. Wood*, 451 F.3d 1122, 1136 (10th Cir. 2006). If so, the court must grant defendants qualified immunity.

The Fourth Amendment prohibits the government from unreasonably removing children from their home. *See Burgess v. Houseman*, 268 F. App'x 780, 783 (10th Cir. 2008) (finding an unreasonable seizure when a social worker helped seize and detain a child without a warrant or probable cause to

believe the child would be abused if she remained in her mother's custody); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1244 (finding a child was unreasonably seized within meaning of the Fourth Amendment when state actors removed him from his home under belief that his health was at risk.). Plaintiffs maintain that in the Tenth Circuit, the law is clearly established that obtaining a court order to seize a child through distortion, misrepresentation, and omission is a violation of the Fourth Amendment. *See Malik*, 191 F.3d at 1316 ("Officials cannot reasonably assume that the law permits them to obtain a custody order in retaliation for a parent's retaining counsel and through reckless omission of probative facts to a magistrate.").

In *Malik*, a police officer and state social worker sought an order from a magistrate judge to remove a four-year-old girl from her mother's custody so that they could interview her regarding nude photographs taken of her. *Id*. at 1310–13. In seeking the order, the social worker failed to inform the judge that authorities did not consider the girl to be in imminent danger, that the photographs were five months old and taken by an uncle who did not live in the area, that the mother had already been interviewed, that the officer had already cancelled one of the previously scheduled interviews with the child, and that a medical professional had expressed doubt that the child had bruises on her in the photographs. *Id*. at 1311–12. The social worker also failed to mention that the mother had retained an attorney who had insisted on certain conditions for the child to be interviewed, and proposed alternative interview dates should officials agree to the conditions. *Id*. at 1310. The magistrate judge granted the order and once the child had been removed from her mother's custody, another officer allegedly told the mother, "this wouldn't have happened if you hadn't gotten an attorney." *Id*. at 1312. The Tenth Circuit found the officer and social worker were not entitled to qualified immunity because "[o]fficials' desire to circumvent an attorney's attempt to negotiate protective conditions for an interview does not rise to the level of an extraordinary circumstance dangerous to the child . . .," because the magistrate judge's

order was procured because of relevant factual omissions, and because it was clearly established that an individual's rights are violated when a police officer retaliates against him for hiring an attorney. *Id.* at 1315–16.

Defendants, however, note that the Tenth Circuit has found qualified immunity for social workers in suits against them for violations resulting from the removal of children. In *Gomes v. Wood*, for example, the Tenth Circuit found that because officers of reasonable competence could disagree as to whether an immediate threat to the safety of the child did not exist, the social worker—who had recommended removal of a child who had suffered a skull fracture—was entitled to qualified immunity. 451 F.3d at 1137. In granting qualified immunity, the Tenth Circuit emphasized that "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." *Id.* Further, qualified immunity should only be denied if, when presented with all relevant information in the case, a reasonable official would have "understood that there were no 'emergency circumstances which pose an immediate threat to [the child's] safety.'" *Id.* In deciding whether officials have a reasonable suspicion of threat to a child, courts must consider "*all relevant circumstances*, including the state's reasonableness in responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child." *Id.* at 1131.

The court agrees with plaintiffs that the allegations in the second amended complaint—that defendants sought the ex parte order knowing there was no emergency and knowing they were omitting and misrepresenting relevant facts—does violate clearly established Tenth Circuit law. Yet the Tenth Circuit has recognized the difficulty social workers face in making "on-the-spot judgments on the basis of limited and often conflicting information . . . with limited resources to assist them," and has emphasized that courts must consider all relevant circumstances when deciding whether an official acted

within the bounds of the law.  *Id.* at 1138, 1131.  Therefore, the court must consider not only plaintiffs'

allegations but also the uncontested documents provided by defendants in support of their motion to

dismiss to determine whether any official could disagree with the reasonableness of defendants' conduct.

As mentioned above, plaintiffs claim constitutional violations based on defendants' alleged

omissions and misrepresentations in seeking the ex parte order of protective custody.  Plaintiffs argue

defendants knew no exigencies existed to justify removing them from their mother's custody and that

the ex parte order was invalid, and therefore, their removal was a seizure under the Fourth Amendment.

Again, the Tenth Circuit has instructed us to give deference to officials who are acting to protect children,

and to consider all the relevant circumstances.  In reviewing the documents attached to defendants'

motion to dismiss, the court will briefly summarize defendants' and the Johnson County District

Attorney's positions in regard to plaintiffs, their siblings, and John and Jane Doe.

In the Motion for Request For Ex Parte Orders of Protective Custody, the Johnson County District

Attorney stated that CINC petitions had been filed for all ten children and that the facts alleged in the

petitions "pursuant to the investigation of [DCF], remained the primary concern the State has for the

welfare of the minor children."  (Doc. 123-1 *SEALED*, at 2.)  After the petitions were served on the

parents, John Doe contacted defendant Abney to express his willingness to cooperate with the DCF

investigation and services.  This information was passed along to defendant Gildner.  Defendant Webb

contacted John Doe and he also expressed to her he wanted to work with Family Preservation as soon as

possible, and that he intended to cooperate with DCF.  On May 1, defendant Gildner received a message

from the children's maternal grandmother, who stated that one of her children had driven by the Doe

home and had seen them loading luggage into their vehicle, and that later the home was dark and the

family's vehicle was gone.  The family's social worker for SRS benefits stated that the family's food

stamp card had been used in Colorado on May 2 and May 3.  The District Attorney then stated "[b]ased

on this information, [DCF] has reason to believe that [Jane Doe] and the children have left the State of Kansas. Based upon these activities as well as the facts as outlined in the petitions filed of record, the State believes that the children may be at imminent risk for harm." (Doc. 123-1 *SEALED*, at 3.)

Because the motion for the ex parte order was based partially on the allegations in the CINC petitions, it is necessary to summarize those here. It is important to note that while plaintiffs allege the CINC petitions were not based on probable cause, they have not contested the facts in the CINC petitions. According to the petitions, filed by the Johnson County District Attorney, DCF began working with the Doe family in June 2008 after allegations of sexual abuse of one of the non-plaintiff children arose. This non-plaintiff child alleged that a maternal relative had touched her inappropriately. The Doe family was estranged from the maternal relatives because Jane Doe felt it was inappropriate that this same maternal relative had been tickling her children.

The non-plaintiff reporting child as well as two other non-plaintiff children were interviewed about the allegations. The maternal relative was also interviewed by police regarding the allegations, which he denied. Because the allegations were unsubstantiated, DCF closed the case. DCF recommended Jane Doe seek counseling to address anger toward her family, as she had reported she had been sexually abused by a relative.

In November 2008, DCF received another report alleging the original reporting non-plaintiff child had disclosed additional information about the alleged sexual abuse by the maternal relative. The child was again interviewed, but the details were inconsistent with the original report. In December 2008, another non-plaintiff child reported that she and the original reporting non-plaintiff child were given pills, shown dead animals, and forced to watch pornography on the maternal relative's computer. Jane Doe reported that the maternal relative threatened to kill the children if they told anyone about the alleged abuse and that he gave the children injections, showed them pornography on his computer, and

forced them to watch animals being shot and mutilated.  She also alleged the relative pushed his mother down the stairs in front of the children.

DCF notified law enforcement about these allegations and concern was expressed regarding Jane Doe's mental stability as she recently had given birth and had a history of post-partum depression.  DCF was concerned that because of the "fantastic nature" of the allegations, Jane Doe may be experiencing delusions related to the allegations.  After further interviews of the children, law enforcement executed a search warrant for the computers in the maternal relative's home.  There was no pornography found on any of the computers.  Based on the children's statements, an elder abuse investigation was also initiated, but was closed as the allegations were unconfirmed.  Through this investigation, however, officials found out that the maternal relative and Jane Doe's mother and father had loaned the Doe family tens of thousands of dollars to help with necessities with the understanding the Doe family would pay them back.  When the maternal relative confronted John and Jane Doe about how the money was being spent, John and Jane Doe became upset and cut off contact with the maternal side of the family.  John and Jane Doe had also been involved with several lawsuits and had legal issues related to passing bad checks.  Jane Doe had allegedly been soliciting money on the internet and the family had to file for bankruptcy.  The maternal side of the family had expressed concern for the children's physical and emotional well-being and Jane Doe's mental health and safety.  DCF had also received documentation that Jane Doe had been participating in online chat groups for victims of sexual abuse and had been asked to leave due to people being uncomfortable with her and feeling that she had been lying about allegations she had been reporting.

The family initially had accepted DCF's offer of Family Preservation Services, but later declined, stating the children were going to continue therapy and that Jane Doe was going to begin therapy elsewhere.  In March 2009, John Doe called DCF to express his disappointment with their services.

Shortly after, DCF was informed by Leawood, Kansas and Kansas City, Missouri Police Departments that law enforcement and the FBI were involved in an investigation regarding allegations that the maternal relative had taken some of the Doe children to a bar in Kansas City, Missouri, had given them shots, stripped them naked, and made them lick a dead rat. Both agencies declined to further investigate the allegations based on lack of information.

DCF expressed concern about the "fantasticality" of the allegations and the high frequency of reports from the family. DCF believed that much of the information reported by the Doe family was untrue based on reports from others interviewed during the investigation. John Doe had reported he would continue to seek action against the maternal relative, including filing a lawsuit, and DCF was concerned about the emotional impact this would have on the children due to their continued exposure to interviews and investigations because of their parents' action. DCF reported they had attempted to discuss these concerns with John and Jane Doe, but the first meeting was rescheduled, and the second meeting was canceled by John Doe, who had expressed he no longer wanted to cooperate with DCF. DCF believed John and Jane Doe were unwilling to listen to DCF's concerns regarding their children and DCF remained concerned with the children's emotional well-being and safety, as Jane Doe was the primary caregiver, was home with the children all day, and was potentially suffering from mental health issues. DCF believed that, based on reports, the source of much of the information regarding the allegations was from Jane Doe, not the children. And John and Jane Doe had become increasingly uncooperative in the investigation, and had recently denied DCF requests to interview the children.

The petition then stated that reasonable efforts have been provided to prevent removal of the children from the home, including ensuring the children were safe from the alleged perpetrator in the original investigation, and that the children and Jane Doe had been participating in therapy. DCF noted, however, that financial support from the maternal relatives had been cut off, and that the family declined

Family Preservation Services and had been declining to cooperate with DCF.  The petition then stated it was contrary to the children's welfare to remain in the home and that placement out of the home was in the best interest of the child due to: concerns about how the children's emotional and physical needs were being met, the continued on-going investigations and fantastic allegations being made against the maternal relative and the impact this had on the children's emotional health, and Jane Doe's mental stability.

As mentioned above, the court set a hearing on the petitions for May 11, 2009.  On May 5, 2009, the Johnson County District Attorney filed an affidavit in support of a pick-up order of the children after the ex parte order of protective custody was issued.  In the affidavit, the Johnson County District Attorney claimed that on May 5, defendant Gildner responded to the Doe family home after it was reported John Doe was seen there.  He informed defendant Gildner he would not divulge the whereabouts of his children and that any communication would need to go through his attorney.  The District Attorney stated the pick-up order was necessary "to assure the juvenile's continuing placement, is necessary as there is no assurance that said juvenile will appear for hearing in this Court, and is made in the best interest of the child and the community."  (Doc. 123-11 *SEALED*, at 3.)

The court finds it is important to outline the facts from the Johnson County documents as they refute many of the "misrepresentations and omissions" plaintiffs rely on to support their argument that defendants violated their constitutional rights.  For example, plaintiffs allege that defendants had represented that "the parents had committed physical, sexual, mental, or emotional abuse when such statement had no basis in the facts alleged in the CINC petitions or in the facts known to defendants."  As the details from the CINC petitions make clear, defendants had concern that the children were subject to at least emotional and mental abuse, and the facts alleged provided support for this concern.  Plaintiffs also claim "that John and Jane Doe had refused Family Preservation Services when in fact John Doe had

specifically accepted the offer of Family Preservation Services." In the motion for the ex parte order, the District Attorney specifically states that after the CINC petitions were filed, John Doe accepted the offer of Family Preservation Services and stated he was willing to cooperate with DCF. Further, plaintiffs claim that defendants knew the Doe children were not in danger because they initially closed their file, disbelieved the children's abuse had actually occurred, and didn't seek immediate custody of the children upon filing the CINC petitions. The motion for the ex parte order, however, states that the allegations in the CINC petition, combined with the parents taking the children out of state, created an immediate need to take custody of the children. The CINC petition itself stated *it was contrary to the children's welfare to remain in the home and that placement out of the home is in the best interest of the child due to*: concerns about how the children's emotional and physical needs are being met, the continued on-going investigations and fantastic allegations being made against the maternal relative and the impact this has on the children's emotional health, and Jane Doe's mental stability. (Emphasis added.)

Based on a review of the Johnson County documents, the court can distinguish this case from the facts of *Malik*, which plaintiffs rely on to show the law was clearly established. In *Malik*, the evidence showed the officials had no reason to remove the child from the home beyond the fact that they were having difficulty scheduling the child for an interview. There were no facts that the child was in danger, and the social worker omitted material facts about the situation when seeking an order from the magistrate judge. Here, the District Attorney, likely based on a recommendation from defendants, sought an ex parte order of protective custody based on the allegations in the CINC petition and the parents' post-petition conduct—removing the children from the state and not being forthcoming about the children's whereabouts. Most of the claimed "misrepresentations and omissions" set forth in plaintiffs' complaint are refuted by the Johnson County documents or are not material. Plaintiffs do claim that

there were no travel restrictions placed on the family in the time period between the filing of the petition and the hearing, and therefore it was unreasonable to use the family's travel to justify the ex parte order. The court has not found any travel restrictions in any of the documents. The court, however, has to give reasonable deference to defendants' judgment in deciding when a child may be in danger.

The court therefore finds that reasonable officials could disagree as to whether there was a threat to plaintiffs' safety. And based on the factual allegations in the CINC petition—which have not been contested—combined with the parents' post-petition conduct, it would be reasonable for an official to believe an ex parte order of protective custody was justified.

For these reasons, the court finds defendants are entitled to qualified immunity because the law is not clearly established that their conduct violated plaintiffs' constitutional rights.

**IT IS THEREFORE ORDERED** that defendants' Motion to Dismiss Second Amended Complaint (Doc. 120) is granted.

This case is closed.

Dated March 7, 2018, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**